

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

SEP 10 2024

KEVIN P WEIMER, Clerk
By_____ Deputy Clerk

Curtis Parker
1149 Autumn Glen Way
Dacula, GA. 30019
(770) 369-6521

Plaintiff, Pro Se

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Plaintiff, Pro Se                              *

Vs.                                            *.  CIVIL ACTION NO. **1:24-CV-4055**

S3 Shared Service Solutions LLC,               *

Defendants                                     * **JURY TRIAL DEMAND**

## COMPLAINT

Comes Now, Plaintiff, Curtis Parker and files his Complaint against the above-named Defendant on the following grounds:

## INTRODUCTION

1.

This is an action for race discrimination pursuant to 42 U.S.C. § 2000e et seq. (Title VII of the Civil Rights Act of 1964), as amended by the Civil Rights Act of 1991.

## JURISDICTION

2.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

1

3.

Defendants are an "employer" engaged in an industry affecting commerce as defined by 42 U.S.C. § 2000e(b).

Defendant S3 Shared Service Solution, LLC "may be served with summons and process by service upon its registered agent Christopher Rahl ESQ. 1001 Fleet Street, Suite 700 Baltimore MD 21202

4.

This Court has jurisdiction over Defendant S3 Shared Service Solution, LLC hereinafter referred to as "S3".

## VENUE

5.

S3 is a Credit Union Service Organization and employs individuals across the United States including Georgia, within the Northern District of Georgia. Venue in this district is proper for the Defendant pursuant to 28 U.S.C. § 1391(b) & (c).

## THE PARTIES

6.

The Plaintiff is a male residing in Dacula, Gwinnett County Georgia, within this Court's jurisdiction.

7.

S3 is a Credit Union Service Organization which responds to member inquiries from its credit union partners of; Bethpage Federal Credit Union of New York, SECU Credit Union of Maryland and BELCO Credit Union of Colorado.

2

## Terminated For Speaking Out Against Discrimination

8.

For there to be "protected activity," the evidence must show that a person opposed a recipient's actions that the person reasonably and in good faith believed violated Title VI or participated in a matter that reasonably or in good faith alleged a violation. Peters, 327 F.3d at 320-21; Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir. 1990); Kimmel, 639 F. Supp. 2d at 43. Opposition or complaints can be oral or written. Kasten v. Saint-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1336 (2011).

9.

On November 3rd, 2023, five (5) days after Mr. Parker last spoke out against discrimination in the workplace, S3 retaliated and terminated him on the pretense of making too many SWBC errors as evidenced below. We contend the above statements rise to the level of protected activity upon which a retaliation claim exists.

10.

According to S3, Mr. Parker was terminated for SWBC errors, See **Exhibit** (A) S3's EEOC Position Statement Page (7)

Mr. Parker was terminated on November 3, 2023, because he continued to make an unacceptable number of errors when processing member payments within the SWBC payment system.

The continual SWBC errors did not meet the expectations set forth in the **Final Written Warning for Call Quality Scores (Exhibit10),**

Mr. Parker was, therefore, terminated on November 3, 2023, due to his failure to show immediate and sustained improvement **with respect to SWBC errors.**

3

11.

The evidence will prove S3 terminated Mr. Parker without benefit of their customary three-step corrective action write-up process, for the violation for which he was terminated.

12.

**For benefit of understanding, what is S3's Three Step Corrective Action Write Up Process?**

See **Exhibit** (A) S3's EEOC Position Statement Page (3)

> **S3's Corrective Action System includes three steps (1) Verbal Warning, (2) Written Warning, and (3) Final Warning.** Following a Final Written Warning an employee's failure to improve or additional misconduct will generally result in termination.

13.

**Are SWBC Errors Subject to S3's three Step Corrective Action write up Policy?** Yes

See **Exhibit** (A) S3's EEOC Position Statement Page (4)

> If SWBC errors become a repeat or recurring issue or negatively impact a member or partner credit Union, S3 could move to additional corrective action.

14.

**For benefit of understanding What is an SWBC error?**

See **Exhibit** (A) S3's EEOC Position Statement Page (4)

> Part of the Existing Loans Team responsibilities included processing member loan payments funded from external financial institutions in the external payment processing system called "SWBC". Data entry errors made by MSRs when using SWBC Payment system are considered SWBC Errors.

4

15.

See **Exhibit** (A) S3's EEOC Position Statement Page (7):

> Mr. Parker was terminated on November 3, 2023, because he continued to make an unacceptable number of errors when processing member payments within the SWBC payment system".
>
> The continual SWBC errors did not meet the expectations set forth in the **Final Written Warning for Call Quality Scores (Exhibit10)** (See Exhibit 10).

16.

- S3 references **Exhibit** (10) and implies and states it is a corrective action for SWBC errors, the violation for which Mr. Parker was terminated.

- S3 state **Exhibit** (10) is the final write up that lead to Mr. Parkers termination for SWBC errors.

- S3 also state and implies in their EEOC Position statement that Mr. Parker was put on a verbal, a written and ultimate Final warning (Exhibit10) for SWBC error as evidenced above.

17.

The Truth is **Exhibit** (10) is not a corrective action for SWBC errors as S3 has stated and implied ...**Exhibit (10) is a corrective action for Mr. Parker's Call Quality Scores and Not for SWBC Errors!**

Furthermore, the evidence will prove, after visual review of Exhibit (10)

- It does not state an expectation regarding making SWBC errors.

- It does not state the consequences for not meeting unknow expectations regarding SWBC errors.

- It does not state consequences for making additional SWBC errors,

5

- Exhibit (10) evidence a conspiracy by S3's management and human resources department to retaliate and unlawfully terminate Mr. Parker, it also evidence phase (1) of a scheme, that will be used 30 days later to unlawfully terminate Mr. Parker.

- Mr. Parkers direct manager Chris Klunk used a Call Quality Score write up as a vehicle to unlawfully terminate Mr. Parker by just adding verbiage "In Addition" to his call quality score write-up.

- This additional SWBC verbiage added by Mr. Parker's manager Chris Klunk, listed some random SWBC errors on Mr. Parkers' non-related Call Quality Score write up.

- Why didn't manager Chris Klunk put Mr. Parker on a proper corrective action for SWBC errors vs. adding this non-related verbiage?

- Why did manager Chris Klunk add unorthodox "SWBC error verbiage" to a non-related call quality score write up, when he could have just as easily put Mr. Parker on a proper corrective action write up for SWBC errors on the same day?

- Mr. Parker direct manager Chris Klunk added some random SWBC verbiage to Mr. Parkers non-related October 2023 Call Quality Scores final write up. The evidence will prove the addition of this random SWBC verbiage was just **phase (1)** of a scheme to unlawfully terminate Mr. Parker. This fact is evidenced by visually examining **Exhibit** (10) and looking for the" **In addition"** verbiage.

18.

**For benefit of understanding What is a Call Quality Score?**

See **Exhibit** (A) S3's EEOC Position Statement Page (3):

> As part of their performance metrics, each Member Service Representative (MSR) is evaluated on four randomly selected telephone customer calls each month. Each of the four calls is scored, including security verification, providing accurate information to the caller, and transferring the member to the correct specialized department when applicable. The average of the four scores is the Member Service Representative 's monthly Call Quality score. S3 expects its MSRs to strive for a monthly Quality score of **80%** and requires a minimum Quality score of **70%**.

19.

**Are Call Quality Scores associated with, or related to SWBC errors?**  NO.

See **Exhibit** (A) S3's EEOC Position Statement Page (4):

> Accordingly, S3 considers SWBC errors as a separate category of Performance metrics from the monthly Call Quality Scores when evaluating the performance of member service representative.

20.

**Does S3 Consistently Enforce Its Performance Expectations Even-handedly when it comes Mr. Parker and other black employees?**

See **Exhibit** (A) S3's EEOC Position Statement Page (5):

> S3 consistently enforces its performance expectations even handedly terminates employees for performance issues. The discipline process is implemented consistently and without regard to race.

7

21.

The Supreme Court has defined retaliation as an intentional act in response to a protected action. Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173-74 (2005). Citing Jackson, the court in Gutierrez underscored the intentional nature of a retaliation complaint: "Retaliation is, by definition, an intentional act. It is a form of "discrimination" because the complainant is being subjected to differential treatment." Gutierrez, 2005 WL 2346956, at *5.

## STATEMENT OF FACTS

22.

The first time Mr. Parker was treated differently because of his race was on April 24th, 2023, less than three weeks after joining manager Chris Klunk's team. On April 18, 2023, Mr. Parker received a call from an elderly black Bethpage Federal Credit Union member who stated she was a victim of **fraud and trickery**.

23.

The elderly member stated an automotive dealership had taken advantage of her and put her into a fraudulent lease agreement yesterday. She also stated she had been up all-night crying. She stated Bethpage Credit Union, and the automotive dealership were "**in cahoots together**" to trick her into the lease.

24.

Mr. Parker advised the elderly member to return the vehicle to the dealership asap and videotape herself dropping off the keys. Mr. Parker also advised the member to "write a letter stating the facts, then date and sign the document. The above statements are confirmed in **Exhibit** (5A) Call Log Notes and **Exhibit** (5B) Email Call Log.

8

25.

On April 24, 2023, despite Mr. Parker being a new hire, S3's management treated him different than other employees when they arbitrarily issued him a "Final Written Warning" for the so-called violation of "policy/procedure" as evidenced in Final Written Warning for Policy/Procedure see **Exhibit** (6).

See **Exhibit** (A) S3's EEOC Position Statement Page (3):

S3 did not terminate Mr. Parker because it was his first instance of violation of policy/procedure" Instead, S3 issued Mr. Parker a Final Written Warning for violation of policy.

26.

**Mr. Parker Speaks Out Against Discrimination in The Workplace**

On multiple occasions including June 6, June 25, and **October 30, 2023**, Mr. Parker made specific statements to his direct manager, Chris Klunk, that he felt he was being unfairly targeted and treated differently based on his race. S3 acknowledges these three meetings in their EEOC Position Statement but state **Mr. Parkers "statements were vague"**. As evidenced below.

27.

See **Exhibit** (A) S3's EEOC Position Statement Page (3).

On three occasions, June 6, June 25, and October 30, 2023, Mr. Parker made non-specific statements to his direct manager, Chris Klunk, that he felt he was being unfairly targeted and treated differently than other Member Service representative with respect to his performance issues. Mr. Parker, however, never stated (or suggested) that the alleged unfair treatment and/or targeting was based on his race, nor did he ever make any racial discrimination complaint while employed at S3. Mr. Parker's vague statements do not rise to the level of protected activity upon which a retaliation claim could exist.

28.

Mr. Parker contends his statements were **Not Vague** but clear and concise and these video conference meetings referenced above were recorded by Manager Chris Klunk and the facts in question are easily verifiable.

29.

Mr. Parker had many meetings with his manager Chris Klunk, but S3 referenced these three dates for a purpose, because on these three dates Mr. Parker was most forceful regarding his statements and demands regarding discrimination in the workplace.

## THE UNLAWFUL TERMINATION OF CURTIS PARKER

30.

On November 03, 2023, five days after Mr. Parker last spoke out against discrimination in the workplace. He was called into a video conference meeting with S3 director Chris Baker and Human Resources executive Chelsea Skoke.

In that meeting Mr. Parker was told by Director Chris Baker that he was being terminated for "Making too many SWBC Errors".

(*We contend that this was phase (2) of a conspiracy and scheme to unlawfully terminate Mr. Parker*) (Phase (1) was when Mr. Parkers direct manager Chris Klunk added *some* random "SWBC verbiage" to his non-related Call Quality final Write Up.)

31.

During the termination call, Mr. Parker was fully aware he had never been placed on any Proper Corrective Action for SWBC Errors, and knew this action was retaliation, nonetheless he submitted to this unlawful termination.

32.

While employed at S3 Mr. Parker only received four Corrective Action Write ups and NEVER received a corrective action write up for SWBC errors, the violations for which he was terminated.

This fact is further supported by Exhibits entered to evidence by S3 via their EEOC Position Statement. See **Exhibits (6), (8), (9) and (10)**.

Exhibit (6) Final Warning, issued on April 24, 2023, for Policy/Procedure (issued for assisting the elderly black member)

- Exhibit (8), Verbal Warning issued on August 1, 2023, for Call Quality Scores.

11

- Exhibit (9), <u>Written Warning</u> issued on September 5, 2023, for Call Quality Scores

- Exhibit (10), <u>Final Warning</u>, issued on October 1, 2023, for Call Quality Scores

None of these "Corrective Action Write Ups" or their accompanying emails reference "SWBC Errors" in their subject line.

33.

During the termination call, Mr. Parker asked H.R executive Chelsea Skoke if he would be receiving Unemployment? she replied, "That would be up to the Great State of Georgia".

34.

After the termination call ended, H.R executive Chelsea Skoke sent Mr. Parker a "Separation Notice" via email that <u>Did Not state a "Termination Reason"</u> despite this being standard practice. (*We contend this is not a coincidence but phase (3) of a conspiracy and scheme to unlawfully terminate Mr. Parker*).

35.

Mr. Parker immediately emailed Human Resource Executive Chelsea Szoke back regarding the missing **"termination reason"** and asked that a termination reason be provided for Unemployment benefit purposes as evidenced in **Exhibit** (C) an email dated November 6, 2023, from Mr. Parker sent to H.R executive Chelsea Skoke.

Good morning,

Chelsea, I am in receipt of the "Separation Notice letter" and documents. In reviewing the documents, we noticed the <u>Termination Reason was Not Stated.</u> In the meeting with Chris Baker and yourself, <u>Chris stated the termination reason was a result of errors in the SWBC payment system.</u>

12

36.

On November 8, 2023, Chelsea Szoke explicitly refused to provide Mr. Parker a "termination reason" on his Separation Notice, see **Exhibit** (G), an email dated November 8, 2023, from Chelsea Skoke sent to Mr. Parker that reads as follows:

> The purpose of the separation email is to provide instructions and information about your pay and benefits, "NOT TO EXPLAIN THE REASON FOR SEPERATION". If you have any additional questions about what we discussed, please feel free to give me a call.

*(Why didn't Mrs. Skoke provide Mr. Parker with the termination reason on his Separation Notice if it was standard practice to do so?)*

## THE CONSPIRACY UNRAVELS

37.

On Monday November 27, 2023, a representative from the Georgia Department of Labor (GDOL) called Mr. Parker and asked him why was he terminated from S3?

38.

Mr. Parker responded, "I was terminated as retaliation for speaking out against discrimination in the workplace. I was told by Director Chris Baker that I was being terminated for making too many **"SWBC Errors"**, however, I was never put on any proper corrective action for SWBC Errors which supports my claim of retaliation.

39.

The GDOL representative told Mr. Parker S3 stated he was terminated for **"Poor Call Quality Scores."**, She then began to go over several months of Call Quality Scores that were in her possession. The representative asked Mr. Parker if he had ever been put on any corrective actions for **"Poor Call Quality Scores"**?

13

40.

Mr. Parker responded Yes, he had been put on a final corrective action write up for his Call Quality Scores beginning October 1, 2023, and had to have a Call Quality Score of 70% or better, by the end of October in order not to be terminated for Call Quality.

41.

Mr. Parker then stated he had the highest Call Quality Scores on his team for the month of October 2023, as was necessary to satisfy the requirement of the corrective action plan. This fact is evidenced in **Exhibit** (A) S3's EEOC Position Statement Page (5):

Mr. Parker had the second-Highest Quality Score on his team for the month of October. He did not, however, have the best performance score on his team as asserted in his EEOC charge. Mr. Parker's October 2023 Call Quality Scores were 100, 100, 100 and 94%.

42.

Mr. Parker asked the representative if she received his **October Call Quality Scores**. The GDOL representative stated she Did Not have the October 2023 Call Quality Scores; they were not sent (coincidence)? (We contend NOT)

43.

Mr. Parker asked the GDOL representative if she had a copy of his "Separation Notice", and if so, did it state a termination reason?

14

44.

The GDOL representative stated she did have a copy of the Separation Notice, and it stated a termination reason of "Poor Call Quality Scores", and was supported by three (3) progressive corrective actions write up of a verbal, written and **Final** for Poor Call Quality Scores dated and signed by Mr. Parker. (We contend this act is phase four (4) **of** a conspiracy and scheme to unlawfully terminate Mr. Parker).

45.

Mr. Parker responded, my "Separation Notice" did Not state a **"termination reason"** and S3 H.R department would not provide me, even after I requested one be provided. The agent and Mr. Parker agreed their Separation Notices were different regarding the "termination reason".

46.

After the call ended Mr. Parker immediately emailed H.R executive Chelsea Szoke to let her know he was aware S3 had submitted a false and fraudulent termination reason of **"Poor Call Quality"** to the Georgia Department of labor, and demanded a correction and retraction as outlined below in **Exhibits** (E) and (F), both emails are dated November 27, 2023, sent to Chelsea Skoke from Mr. Parker.

**See Exhibit (E) that reads as follows:**

Chelsea,

I just got off the phone with a representative from the Georgia dept of Labor who state you sent her information indicating My termination was due to Call Quality Scores!

As per the termination conference call, this is not the case. Please contact GDOL and advise of the accurate cause of termination.

In the meeting where I was terminated Chris Baker stated this was not for Call Quality. I have always considered him an honorable man.

If my unemployment is denied, through deception and fraud **I will seek 3 years compensation from S3**.

Regards,

Curtis Parker

**See Exhibit (F) that reads as follows:**

Chelsea,

S3 signed a document stating the information regarding my termination was actual and true. We both know Chris Baker stated I was not being terminated for Quality and the October quality numbers confirm that (you don't know if I recorded the termination call. I know you did). The state of Georgia unemployment representative stated it is and would be a crime if S3 knowingly sought to deceive or mislead her.

I would ask S3 to reconsider going down this path. More than one person will have to participate in this conspiracy for you to be successful. You're putting S3 in legal and financial jeopardy and creating additional harm to me and my family.

47.

Despite Mr. Parker's efforts via email, S3 would not correct or retract the false and fraudulent termination reason provided to the Georgia Department of Labor (evidencing a conspiracy and intent). S3's false and fraudulent termination reason caused Mr. Parkers lawful unemployment benefits to be denied causing him to suffer! financially, emotionally and suffer the humiliation of having to apply for and receive social services including food stamps.

We contend this was the desired outcome and Phase (5) of a conspiracy and a scheme to unlawfully retaliate against and terminate Mr. Parker.

48.

Since he was never put on any proper corrective action for SWBC errors, for this reason alone, Mr. Parker would have been entitled to and granted his lawful Unemployment Benefits.

## In Conclusion

### 49.

After reviewing the facts and exhibits contained within the pages of this lawsuit there should be no doubt, S3 unlawfully retaliated and terminated Mr. Parker via a scheme. If not retaliation, why else would S3 put themselves in legal and financial jeopardy by unlawfully terminating Mr. Parker via a scheme?

### 50.

Why didn't S3 put Mr. Parker on a proper/legitimate corrective action for SWBC Error vs. this backdoor scheme?

### 51.

Using S3's EEOC Position Statement and their own exhibits, we have unequivocally demonstrated that Mr. Parker was never put on any proper three-step corrective action for SWBC errors as required to terminate an S3 Employee, rendering his termination void and invalid.

### 52.

We have unequivocally demonstrated S3 sought to conceal the true termination reason of SWBC errors because Mr. Parker was never put on any proper corrective action for this violation. S3 knew or should have known the termination reason of "Poor Call Quality" was false and fraudulent when they submitted it to the Georgia Department of Labor as evidenced by Exhibit (G) and the fact S3 refused to correct or retract it when asked by Mr. Parker. S3 sent a false and fraudulent termination reason to the GDOL as part of a scheme and because they DID NOT have any corrective action write ups for the violation of too many SWBC errors, the violation for which Mr. Parker was terminated.

53.

We have unequivocally demonstrated S3 used "making too many SWBC errors" as a **pretense** to retaliate and unlawfully terminate Mr. Parker. The question for the court is like Mr. Parker how many other Blacks have been terminated via this or similar schemes as suggested in Exhibit (11) a list of several blacks and Hispanics that have been terminated by S3.

54.

Even after benefit of an investigation into Mr. Parkers claims of retaliation as implied in their EEOC Position Statement , S3 still falsely stated and implied in their EEOC Position Statement that in line with their corrective action process Mr. Parker was indeed issued three (3) progressive corrective action write ups of a verbal, a written and a final write up for SWBC **errors,** a deceptive and deceitful lie as evidenced by S3's own **Exhibit** (10).

55.

These indefensible pre and post termination acts leave no doubt this was a conspiracy to unlawfully terminate Mr. Parker for participating in protected activities. These post-termination actions unveil a scheme orchestrated by S3 management et al to unlawfully terminate Mr. Parker for participating in a protected act.

56.

The conduct of this employer is outrageous and utterly unacceptable, and we Pray this court hold them accountable for their actions, as they warrant serious consequences.

57.

Defendants' discriminatory conduct, in violation of Title VII, has caused the Plaintiff to suffer a loss of pay, benefits, and prestige.

19

58.

Defendants' actions have caused Plaintiff to suffer mental and emotional distress, entitling him to compensatory damages pursuant to 42 U.S.C. § 1981a.

59.

Defendants have engaged in discriminatory practices with malice and reckless indifference to the Plaintiff's federally protected rights, thereby entitling him to punitive damages pursuant to 42 U.S.C. § 1981a.

60.

S3 official and unofficial policies and customs encouraged, caused, allowed, and/or enabled Defendants management team/Supervisors to violate Plaintiffs' constitutional rights.

S3 has not disciplined Manager Chris Klunk, Director Chris Baker, H.R Executive Chelsea Skoke and others for their violations of Plaintiff's constitutional rights and therefore has implicitly approved, ratified, or adopted its agents' unconstitutional actions, yet S3 is responsible for supervision, training, and discipline through its policy-making powers and personnel decisions.

## COUNT ONE

## E: TITLE VII – RACE

## COUNT I: § 1983 CLAIM OF RETAILIATION FOR EXERCISE OF FIRST AMENDMENT PROTECTED ACT ACTIVITY AGAINST DEFENDANT S3

### 61.

Plaintiffs re-allege and incorporate by reference all the preceding paragraphs in this complaint.

### 62.

By maliciously retaliating against Plaintiffs for Plaintiffs' exercise of the constitutional right to speak out against discrimination in the workplace.

## COUNT TWO

## STATE TORT OF CIVIL CONSPIRACY AGAINST DEFENDANTS

### 63.

Plaintiffs re-allege and incorporate by reference all the preceding paragraphs in this complaint.

### 64.

Defendants' management and Human Resource Department conspired together to commit illegal termination of Plaintiff for participating in protected act violation of the United States Constitution's Fourth amendment as applied to the States via the Fourteenth Amendment. This illegal termination of the plaintiff with reckless indifferences to plaintiffs' rights.

### 65.

Defendants conspired to retaliate against Plaintiffs for Plaintiffs clearly established First Amendment constitutional right to voice disapproval of Discrimination in the workplace.

21

66.

Defendants, together, retaliated against Plaintiffs ultimately terminating plaintiff on a pretense of too many SWBC errors.

67.

The actions underlying this conspiracy are illegal under the United States Constitution's First and Fourth Amendments as applied to the States via the Fourteenth Amendment.

**COUNT THREE**

**42 U.S.C. § 1983 CLAIM AGAINST S3 FOR RECKLESS INDIFFERENCE TO PLAIFFS' CLEARLY ESTABLISHED CONSTUTIONAL RIGHTS**

68.

Plaintiffs re-allege and incorporate by reference all the preceding paragraphs in this complaint.

There is an obvious need for S3 to train all its employees on First and Fourth Amendment rights. S3, therefore, has demonstrated a policy of deliberate indifference to such civil rights violations. See City of Canton v. Harris, 489 U.S. 378, 389 (1989).

69.

S3 's callous, reckless, wanton, and malicious actions under color of state law before, during, and after this loss, has caused Plaintiffs to suffer and continue to suffer the damages Plaintiffs have described.

## Pursuant to Gramm-Leach-Bliley Act/ Whistle Blower protection

Under penalty of perjury Curtis Parker states the following: There appears to be Collusion between Bethpage Federal Credit Union and select automotive dealerships, together they finance blacks and other minorities for automotive loans they do not qualify, cannot afford and should never have been approved and funded.

This collusion is devastating to the victims in regard that the minority borrowers struggle to pay their note until ultimately, they fall behind on the payments. This leads to the repossession of the collateral, and for many, financial ruin including bankruptcy.

I have first-hand knowledge of what many Bethpage Federal CU members have said to me after their vehicles were repossessed, "I / We should have never been approved for that loan / car.

**S3's Exhibit 5, Call Log Notes;** S3 Shared Solution LLC and Bethpage Federal Credit Union turned a blind eye to an elderly black member's claim of fraud and trickery, despite their obligation and duty to investigate her claims. S3 and Bethpage neglected the members' claim because she was black, elderly and her financial status was "poor".

Exhibit (5) evidence S3 and Bethpage Credit union chose PROFITS over doing what was right, S3 and Bethpage federal credit union were cognizant the members claim of fraud invalidated the contract as evidenced in an email chain that was sent to Mr. Parker in error regarding this matter, that included a conversation between two S3 executives which affirmed that Mr. Parkers counsel to the elderly member and the elderly member's actions was lawful and acceptable in the event of fraud. (Yet S3 chose to discipline Mr. Parker for interfering)

This collusion was evidenced during a conference call between Mr. Parker and S3 director Chris Baker regarding this matter. In this meeting Chris Baker demanded Mr. Parker verbally

23

state, the elderly black member referenced in Exhibit (5) just **"changed her mind"** and that's why she wanted to take the car back.

Mr. Parker resisted this demand to repeat a lie, because Exhibit (5) clearly evidence the elderly black member NEVER stated, "she changed her mind."

On the contrary she made clear she was the victim of" **fraud and trickery."** After the threat of termination, Mr. Parker reluctantly repeated what he was told to say, **"She changed her mind"** and he was promptly put on a "Final Write Up" for interfering. (see exhibit (6) )

**The above statements are confirmed on page** (3) of S3's EEOC Position Statement that reads as follow:

> *On April 20,2023, S3 received a corporate complaint from Bethpage Federal Credit Union involving a member who signed car loan documents but returned to the dealership the next day demanding to return the vehicle **because they changed their mind**.*

# EXHIBIT A

## WHITEFORD, TAYLOR & PRESTON L.L.P.

RANDI K. HYATT
PARTNER
DIRECT LINE (410) 347-8712
DIRECT FAX (410) 339-4015
RHyatt@whitefordlaw.com

SEVEN SAINT PAUL STREET
BALTIMORE, MARYLAND 21202-1636

MAIN TELEPHONE (410) 347-8700
FACSIMILE (410) 752-7092

DELAWARE*
DISTRICT OF COLUMBIA
KENTUCKY
MARYLAND
NEW YORK
PENNSYLVANIA
VIRGINIA

WWW.WHITEFORDLAW.COM
(800) 987-8705

January 26, 2024

**Submitted Via the EEOC's Respondent's Portal**
**and Email to Investigator Meadows-Fuller [erica.meadows-fuller@eeoc.gov]**

> **Re:    Curtis Parker and S3 Shared Service Solutions, LLC**
> **EEOC Charge No. 531-2024-00861**

Dear Investigator Meadows-Fuller:

This letter sets forth S3 Shared Service Solutions, LLC's ("S3") position statement in the above matter. Mr. Parker's claims of racial discrimination and retaliation are unfounded. S3 only first learned of Mr. Parker's concerns when it received the underlying EEOC charge. As explained more fully below, upon receiving his charge, S3 conducted an immediate and thorough investigation.

S3 could not corroborate that Mr. Parker was subject to any disparate treatment because of his race. On the contrary, S3's investigation confirmed that Mr. Parker was treated the same as other Member Service Representatives ("MSR") in all aspects of performance, quality and expectations. Moreover, S3 could not corroborate that any MSRs were disciplined or scolded for needing to use the restroom.

Similarly, Mr. Parker's claim of retaliation is unfounded. On three occasions, June 6, June 25, and October 30, 2023, Mr. Parker made non-specific statements[1] to his direct manager, Chris Klunk, that he felt he was being unfairly targeted and treated differently than other MSRs with respect to his performance issues. Mr. Parker, however, never stated (or suggested) that the alleged unfair treatment and/or targeting was based on his race, nor did he ever make any racial discrimination complaint while employed at S3. Mr. Parker's vague statements do not rise to the level of protected activity upon which a retaliation claim could exist. Mr. Parker's termination could not, therefore, have been in retaliation for engaging in protected activity. Rather, Mr. Parker was terminated for poor performance, as explained further below. His charge should be dismissed without further proceedings.

---

[1] These statements are detailed further below.

*Whiteford, Taylor & Preston L.L.P. is a limited liability partnership. Our Delaware offices are operated under a separate Delaware limited liability company. Whiteford, Taylor & Preston L.L.C.

Equal Employment Opportunity Commission
January 26, 2024
Page 2

**S3 Is Committed To A Diverse and Discrimination-Free Workplace.**

S3 is a Credit Union Service Organization that serves credit unions by supporting their operations and delivering quality member experiences. S3 operates call centers, which respond to inquiries from the members of S3's partner credit unions. S3 employs individuals across the United States, most of whom work remotely. S3 is committed to its values, for which it uses the acronym "STAR": Service, Teamwork, Attitude, and Results. Teamwork includes showing respect and appreciation for others. Exhibit 1, S3's Values Provision of S3 Employee Handbook. Employees are trained on, and expected to act in accordance with, S3's values.

S3 has a diverse workforce. Of the three hundred and fifty-seven (357) MSRs working for S3 in 2023, more than seventy-eight percent (78%) identified as a Person of Color, and more than fifty-one percent (51%) identified as Black or African American.

S3 is committed to equal employment opportunity and does not discriminate against employees or applicants for employment on any protected basis, including race. S3 considers discrimination, harassment, and retaliation to be serious offenses. Employees who believe they have been subject to discrimination, harassment or retaliation are encouraged to immediately report the incident to their supervisor, the Director of Human Resources, or their designee.

Complaints are investigated promptly and handled confidentially, to the extent possible. Employees utilizing this complaint procedure are protected against retaliation. Employees and managers are trained in their rights and obligations under the relevant employment statutes and as required by applicable state law. Mr. Parker received and was educated on S3's policies and practices when he was hired. Exhibit 2, Relevant Handbook Policies, p. 9 (Equal Employment Opportunity); p. 10 (Diversity, Equity, and Inclusion); pp. 11-13 (Anti-Harassment, Discrimination and Retaliation; Complaint Procedure and Confidentiality); Exhibit 3, Parker Employee Handbook Acknowledgement.

**Member Service Representatives Are Trained For And Measured On Their Member Interactions.**

Mr. Parker was hired as an MSR on November 14, 2022. As an MSR, Mr. Parker was responsible for responding to member and potential member telephone inquiries regarding membership, products, and services. The primary responsibilities of MSRs include navigating system applications to resolve inquiries; providing timely, friendly, and accurate service and guidance to members; and accurately verifying, documenting, and processing member transactions. Exhibit 4, Service Representative Position Description.

New hire MSRs participate in a four-month onboarding and training program before being placed on a call center team. During the training period, MSRs handle member telephone calls while receiving significant guidance, feedback, and coaching regarding their performance. After training, each MSR is placed on one of three call center teams based on the MSR's career goals and S3's business needs. Once placed on a call center team, MSRs are supervised by their assigned team manager and are expected to work more independently and with less oversight.

Equal Employment Opportunity Commission
January 26, 2024
Page 3

As part of their performance metrics, each MSR is evaluated on four randomly selected telephone customer calls each month. Each of the four calls is scored based on the MSR's performance measured against specific requirements of every customer call, including security verification, providing accurate information to the caller, and transferring the member to the correct specialized department when applicable. The average of the four scores is the MSR's monthly Quality score. S3 expects its MSRs to strive for a monthly Quality score of 80% and requires a minimum Quality score of 70%. Any MSR who falls below the 70% Quality score minimum for two (2) or more months in the previous six- (6) month period is issued a corrective action. An MSR's repeated failure to meet the Quality score minimum will result in additional performance-related corrective action.[2]

**Mr. Parker Repeatedly Failed To Meet Performance Standards.**

On or around April 1, 2023, after completing training, Mr. Parker joined the Existing Loans Team, S3's call center team responsible for answering questions and processing loan payments for existing members of S3's partner credit unions. Less than three (3) weeks after Mr. Parker joined the team, on April 20, 2023, S3 received a corporate complaint from a partner credit union involving a member who signed car loan documents but returned to the dealership the next day demanding to return the vehicle because they changed their mind.

After investigation, S3 discovered that Mr. Parker handled an April 18, 2023, call from the member, and improperly advised the member to return the vehicle to the dealer and videotape dropping off the keys. Mr. Parker's notes documenting his call indicate that he advised the member to "write a letter saying she doesn't want the car and to date and sign the paper, and by law they have to honor it." Exhibit 5, April 18, 2023, 11:12 a.m. Parker Call Log Notes.

Mr. Parker's improper conduct resulted in several significant impacts to S3, including a rarely received corporate complaint raised due to Executives at the S3 partner credit union getting involved with this debacle. S3 did not terminate Mr. Parker because it was his first instance of failing to follow proper policy/procedure. Instead, S3 issued Mr. Parker a Final Written Warning for violation of policy/procedure. Exhibit 6, April 24, 2023, Final Written Warning for Policy/Procedure.

As a part of the Existing Loans Team, Mr. Parker's responsibilities included processing member loan payments funded from external financial institutions in the external payment processing system called SWBC. Data entry errors made by MSRs when using SWBC, such as associating a member's information with the wrong credit union, result in payment processing failures and

---

[2] S3's Corrective Action system includes three steps: (1) Verbal Warning, (2) Written Warning, and (3) Final Written Warning. Corrective Action has four categories: attendance, performance, policy/procedure, and behavior/conduct. Following a Final Written Warning, an employee's failure to improve or additional misconduct (depending on the relevant category) will generally result in termination.

Equal Employment Opportunity Commission
January 26, 2024
Page 4

delays to member payment processing. Accordingly, S3 considers SWBC errors in addition to and as a separate category of performance metrics from the monthly Quality call scores when evaluating the performance of MSRs.

**Mr. Parker Was Terminated Due To His Sustained Performance Issues.**

Mr. Parker repeatedly failed to meet the minimum Quality score for customer service calls and made an unacceptable number of SWBC errors between when he joined the Existing Loans Team in April and his termination on November 3, 2023.

Beginning in the spring of 2023, Mr. Parker made several SWBC errors. These repeated errors included processing member payments under the incorrect partner credit union, entering incorrect member account numbers, and entering incorrect payment amounts. In April, Mr. Parker sought clarification about the potential consequences of his SWBC errors after he received the Final Written Warning for the incident with the automobile dealership described above. Chris Baker, his Department Head, advised that some errors or mistakes are understandable, and S3 provides coaching on errors and mistakes, but if errors become a repeat or recurring issue or negatively impact a member or partner credit union, S3 could move to additional corrective action. Exhibit 7, April 28, 2023, Mr. Baker Email to Mr. Parker.

In addition to the SWBC errors, Mr. Parker did not meet the minimum Quality score for customer calls in May, June, or July of 2023. His Quality score in May was 61.86%. In both June and July, his Quality score was 44.12%. Normally, S3 issues corrective action for Quality score failings after two months. S3 did not, however, issue Mr. Parker a corrective action until after July, his third consecutive month of failing Quality scores. Mr. Parker received a Verbal Warning for this performance issue on August 1, 2023. The Verbal Warning specified that Mr. Parker needed to meet and maintain the minimum Quality score of 70% by September 30, 2023. Exhibit 8, Verbal Warning for Performance.

Mr. Parker was unable to meet or maintain the Quality score minimum in August or September of 2023. S3 issued Mr. Parker a Written Warning for performance on September 5, 2023, due to his 67.97% August Quality score. The Written Warning confirmed Mr. Parker needed to meet and maintain the minimum Quality score by October 31, 2023. Exhibit 9, Written Warning for Performance. Following his September Quality score of 25%, and in line with its progressive discipline process, S3 issued Mr. Parker's Final Written Warning on October 1, 2023. Exhibit 10, Final Written Warning for Performance.

Between late August and mid-September, in addition to Quality score issues, Mr. Parker made an exceptionally high number of SWBC errors. On August 29, he submitted two different members' payments under the incorrect partner credit union. On September 5, he again processed a payment under the incorrect partner credit union. The very next day, on September 6, he made the same error again. On September 12, Mr. Parker entered an incorrect payment amount. On September 14, he entered a member's external account number incorrectly. On September 19, he failed to enter a transaction description for a payment. Exhibit 10, Final Written Warning for Performance.

Equal Employment Opportunity Commission
January 26, 2024
Page 5

Mr. Parker's Final Written Warning for performance noted these errors and documented that Mr. Parker had met with his Manager, Mr. Klunk, and Department Head, Mr. Baker, about needing to avoid future errors. The Final Written Warning specified that Mr. Parker needed to make immediate and sustained improvement in confirming correct payment amounts, account numbers, and credit unions to ensure accurate payment processing by November 30, 2023. As with all corrective action notices, Mr. Parker met with Mr. Klunk and Mr. Baker regarding his Final Written Warning for performance and the expectations moving forward.

Mr. Parker made three additional SWBC errors in October. Although his October Quality score did improve,[3] his repeated SWBC errors continued to be an issue and did not demonstrate sustained improvement. The continual SWBC errors did not meet the expectations set forth in the Final Written Warning. Mr. Parker was, therefore, terminated on November 3, 2023, due to his failure to show immediate and sustained improvement with respect to errors.

**S3 Consistently Enforces Its Disciplinary Process For Quality Scores And SWBC Errors.**

S3 consistently enforces its performance expectations and even-handedly terminates employees for performance issues. In 2023, S3 terminated twenty-eight (28) MSRs, including Mr. Parker, for failing Quality scores and/or repeated SWBC errors. The discipline process is implemented consistently and without regard to race. *See* Exhibit 11, MSRs Terminated for Performance Issues In 2023.

**Mr. Parker Never Raised Concerns About Racial Discrimination In The Workplace.**

Mr. Parker did not make any racial discrimination complaints while employed at S3. On three (3) occasions, Mr. Parker complained to Mr. Klunk that he felt he was targeted and treated unfairly. His statements were vague and never based on or connected to his race. Such statements do not rise to the level of protected activity upon which a retaliation claim could exist.

On June 6, 2023, Mr. Klunk met with Mr. Parker for their monthly one-on-one meeting, during which they discussed Mr. Parker's numerous errors and mistakes, including three (3) error notifications and coaching Mr. Parker had received in a nine- (9) day period. Mr. Klunk advised Mr. Parker that errors are tracked and that if they continue, corrective action could be warranted. When Mr. Parker asked how he compared to other MSRs in his development, Mr. Klunk responded honestly that he had made more errors and needed more coaching in two and a half (2½) months compared to a lot of other MSRs.

Mr. Parker did not receive Mr. Klunk's honest response well. He began complaining that he was being treated unfairly, being targeted, and felt singled out for SWBC errors, Quality scores, and

---

[3] Mr. Parker had the second-highest Quality score on his team for the month of October. He did not, however, have the "best performance score" on his team, as asserted in his charge.

Equal Employment Opportunity Commission
January 26, 2024
Page 6

his Final Written Warning from the corporate complaint. Mr. Parker did not, however, complain about racial discrimination.

In response to Mr. Parker's concerns about feeling targeted and singled out, Mr. Klunk assured Mr. Parker that all MSRs are treated the same with respect to Quality scores and corrective action and that all coaching emails to MSRs about errors are sent in the same manner and format. Examples of these coaching emails are attached. Exhibit 12, September 7, 2023, Coaching Email to Mr. Parker Regarding Payment Under the Wrong Credit Union; Exhibit 13, September 14, 2023, Coaching Email to Mr. Parker Regarding Incorrect Account Number Entry; Exhibit 14, October 2, 2023, Coaching Email to V.A. (Black or African American) Regarding Processing Payment Under the Wrong Credit Union; Exhibit 15, October 5, 2023, Coaching Email to J.A. (White) Regarding Incorrect Account Number Entry; Exhibit 16, October 17, 2023, Coaching Email to P.C. (Hispanic or Latino) Regarding Incorrect Payment Amount Entry.

When Mr. Klunk and Mr. Parker met again on June 25, 2023, Mr. Parker rehashed complaints about feeling targeted. Again, he did not complain or articulate feeling targeted because of racial discrimination.

After late June 2023, Mr. Parker did not raise any concerns about being treated unfairly, targeted, or singled out until October 30, 2023. During a meeting between Mr. Klunk and Mr. Parker about another SWBC error Mr. Parker had made, Mr. Parker again complained that he felt he was being targeted, asking why so many managers were copied on emails about his errors. Mr. Klunk again assured Mr. Parker that S3 follows the same process for everyone and that the same feedback, template, and format for coaching on errors is given to every MSR. *See* Exhibits 12-16. At no time during this conversation did Mr. Parker voice concerns about race.

**S3's Investigation Into Mr. Parker's Allegations Did Not Corroborate His Claims.**

After receiving the underlying charge of discrimination, S3 immediately commenced an investigation into Mr. Parker's claims. S3 was unable to corroborate any of his concerns.

Mr. Parker's allegation that he complained about disparate treatment due to his race nearly three (3) months into his tenure and was written up one (1) day later is simply false. Mr. Parker was hired on November 14, 2022. He did not complain about racial discrimination in late January or early February of 2023, or at any time during his employment, nor did he receive any disciplinary action in the beginning of 2023.

Mr. Parker's claim that he was denied requests for a time adjustment could not be corroborated. MSRs are expected to adhere to their designated schedules, which include scheduled breaks and lunch times. MSRs receive a monthly Adherence score between 0 and 100 percent based on how closely they adhered to their schedules. For instance, an MSR who actively assisted members on telephone calls at all times except during their scheduled breaks would receive an Adherence score of 100%. S3, however, does not impose strict Adherence requirements. MSRs are encouraged to take restroom and other personal breaks during their scheduled break times, but it is expected that they will take breaks outside of those scheduled when needed. While S3

Equal Employment Opportunity Commission
January 26, 2024
Page 7

communicates that MSRs should aim for Adherence scores of 90%[4] or greater, the company does not discipline MSRs for falling below the Adherence goal.

MSRs' managers can see their phone system activity status and may reach out if they notice that an MSR is in a "Not Ready" state in the phone system for a prolonged, unscheduled period of time. A manager may discuss with an MSR their monthly Adherence score and being mindful about the amount of break time used if their adherence percentage is particularly low. S3 does not, however, discipline MSRs for Adherence scores below the goal.

When Mr. Parker was hired, MSRs who deviated from their schedules due to work-related tasks were trained to request time adjustments so that their Adherence scores would remain accurate. For example, if an MSR scheduled to begin their lunch break at 12:00 p.m. could not begin their lunch break until 12:10 p.m. due to assisting a member on a call, they would ask their manager for a time adjustment to adjust their scheduled lunch break accordingly. S3 stopped the time adjustment request process in early April 2023 after the company began using a new timekeeping system. Instead of requesting time adjustments, MSRs had 36 minutes of flexible break time to use however they wanted throughout the day.

S3 has no record of any time adjustment request submitted by Mr. Parker that was denied. The only time adjustment request Mr. Parker ever submitted was on April 5, 2023, a few days after joining the Existing Loans Team. Mr. Parker requested a time adjustment due to a long call. Mr. Klunk did not deny his request. Instead, he explained to Mr. Parker why time adjustment requests were no longer necessary given the flexibility added into the Adherence process. Exhibit 17, April 5, 2023, Emails Between Mr. Parker, Mr. Klunk, and Ms. Schneider.[5]

Finally, as discussed in detail above, Mr. Parker did not make any racial discrimination complaint to S3, including Chris Klunk, Goldie Schneider, or Chris Baker in October 2023. Accordingly, his termination could not have been in retaliation for engaging in protected activity. Mr. Parker was terminated on November 3, 2023, because he continued to make an unacceptable number of errors when processing member payments within SWBC and was not, despite repeated training and coaching sessions, showing signs of improvement.

While we believe we have provided all the information you need to resolve this matter, please do not hesitate to reach out with any questions.

---

[4] The Adherence score goal was 92% when Mr. Parker was hired. It was reduced to 90% in the spring of 2023 due to a change to S3's timekeeping system.

[5] Mr. Parker's allegation that Black employees were scolded and faced discipline for using the restroom has no basis in fact. S3 does not discipline employees for taking restroom breaks and is unaware of any such situation in which this occurred.

# Exhibit 5

Exhibit 5, April 18, 2023, 11:12 a.m. Parker Call Log Notes read as follows:

1. **The member called saying the dealership put her into a fraudulent lease agreement yesterday, she states she has been up all night, they (Bethpage CU and the dealership) were in cahoots together to trick her into the lease.**

2. She told them to call BP but they prob won't, so she is calling herself, and she doesn't want the car and it was less than 24hrs ago.

3. The agent says she should be well within her timeframe to return the car to the lot and put the keys on someone's desk and says that they must help her out.

4. **The member says that she has been up crying all night and the agent says that she can calm down, but she is okay, it happens to people all the time.**

5. **The member cries saying that they tricked her, and the agent says that she is fine, that is why she has timeframes on contracts.**

6. **The agent goes on to inform the member to take the vehicle back, take someone with her who can videotape her dropping it off, asking the dealer where they want the keys, have a paper that states that you want the contract nullified and that the first payment needs to be made before anything is solid.**

7. The agent tries to pull up the member information and says that we don't have her in the system yet.

8. He suggests she write a letter saying she doesn't want the car and to date and sign the paper.

9. The member says that they told her it was a lease agreement that they sent to BP.

10. **The agent says he has given her very general information to get the ball rolling with the written document and the video but suggests that she obtain an attorney.**

11. The member asks for confirmation if the loan was in the system, the agent says no, the loan isn't in the system.

12. **The member says she will do what was suggested and the call concludes.**

13. *Coaching: 1. This call should have been transferred to loan in process. 2. Shouldn't have given the member what they would do in this situation but reached out for help if **the agent wasn't clear on the process**

# EXHIBIT 5B

| | |
|---|---|
| **From:** | Christopher J. Baker <CJBaker@s3cuso.com> |
| **Sent:** | Friday, April 21, 2023 4:48 PM |
| **To:** | Chelsea Szoke; Caroline Ryan |
| **Cc:** | Christopher Klunk |
| **Subject:** | FW: ▆▆▆▆ 91513793– ▆▆▆▆ Corporate Complaint Curtis Parker |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Team,

We were just made aware of the corporate complaint below. In the summary below, Curtis provided wrong information to the member when the call should have been transferred over to the Loan Processing team.

Let me know if you need anything else.

Thank you,

Chris Baker
Senior Contact Center Manager
S3 Shared Service Solutions, LLC
443-517-5157
www.s3cuso.com

**From:** Candice Lawson <CLawson@s3cuso.com>
**Sent:** Friday, April 21, 2023 3:31 PM
**To:** Christopher Klunk <CKlunk@s3cuso.com>; Goldie Schneider <GSchneider@CUOpsCenter.org>
**Cc:** Carin M. Brown <cabrown@s3cuso.com>; Christopher J. Baker <CJBaker@s3cuso.com>; Lindsey Nowak <LNowak@s3cuso.com>; Jessica M. Boyce <JBoyce@s3cuso.com>; Josselin Perez Ortez <jportez@s3cuso.com>
**Subject:** FW: ▆▆▆▆ 91513793

Good Afternoon,

Please review the call and partner request below and provide coaching to Curtis.

| 04/18/2023 11:12:00 AM | 6:10 | cuparker@s3cuso.com | Inbound | Parker | Curtis |

- The memebr called saying the dealership but her into a fraudulent lease agreement yesterday, she states she has been up all night, they were in cahoots together to trick her into the lease.
- She told them to call BP but they prob won't, so she is calling herself, and she doesn't want the car and it was less than 24hrs ago.
- The agent says she should be well within her timeframe to return the car to the lot and put the keys on someone's desk and says that they have to help her out.
- The member says that she has been up crying all night and the agent says that she can calm down, but she is okay, it happens to people all the time.
- The memebr cries saying that they tricked her, and the agent says that she is fine, that is why she have timeframes on contracts.
- The agent goes on to inform the member to take the vehicle back, take someone with her who can videotape her dropping it off, asking the dealer where they want the keys, have a paper that states that you want the contract nullified and that the first payment needs to be made before anything is solid.

1

- The agent tries to pull up the member information and says that we don't have her in the system yet.
- The suggest she write a letter saying she doesn't want the car and to date and sign the paper, and by law they have to honor it.
- The member says that they told her it was a lease agreement that they sent to BP.
- The agent says he is given her very general information to get the ball rolling with the written document and the video but suggest that she obtain an attorney.
- The member asks for confirmation if the loan was in the system, the agent says no, the loan isn't in the system.
- The member says she will do what was suggested and the call concludes.

*Coaching:

1. This call should have been transferred to loan in process.
2. Shouldn't have given the member what they would do in this situation but reached out for help if the agent wasn't clear on the process.


Thank You,

**Candice Lawson**
**Quality Assurance Specialist, Contact Center**
**S3 Shared Service Solutions, LLC**
**O: 443-517-5383**
CLawson@s3cuso.com

Shared
Service
Solutions, LLC

**From:** Candice Lawson <CLawson@s3cuso.com>
**Sent:** Thursday, April 20, 2023 9:08 AM
**To:** April Harriman <AHarriman@cuopscenter.org>; S3CCQualityandCommunications <S3CCQualityandCommunications@s3cuso.com>
**Subject:** RE: █████ 91513793

Good Morning,

Thank you for sending this request over. Due to current request volume our SLA is 3-4 business days from the receipt of the request. Please advise if this is a time sensitive request so that we can prioritize it accordingly.


Thank You,

**Candice Lawson**
**Quality Assurance Specialist, Contact Center**
**S3 Shared Service Solutions, LLC**
**O: 443-517-5383**
CLawson@s3cuso.com

Shared
Service
Solutions, LLC

**From:** April Harriman <AHarriman@cuopscenter.org>
**Sent:** Thursday, April 20, 2023 9:02 AM
**To:** S3CCQualityandCommunications <S3CCQualityandCommunications@s3cuso.com>
**Subject:** FW: █████ 91513793

Good Morning,

2

**EXHIBIT 6**

| Employee Corrective Action | | | |
|---|---|---|---|
| **Employee's Name** | Curtis Parker | **Date** | 4/24/23 |
| **Employee's Title** | Member Service Representative | **Department** | Contact Center |
| **Date of Hire** | 11/14/22 | **Manager** | Christopher Klunk |

| Type of Corrective Action (select one) | | | |
|---|---|---|---|
| | Attendance | X | Policy/Procedure |
| | Performance | | Behavior/Conduct |

| Level of Corrective Action (select one) | | | |
|---|---|---|---|
| | Verbal Warning | X | Final Written Warning |
| | Written Warning | | |

**Description of Incident**

Curtis, on 4/18/23 at 11:12AM EST you handled a call from a member who recently leased a car using Bethpage as the lender and wanted to cancel the agreement. During the call, you failed to follow proper procedure:

- You told the member she should be well within her timeframe to return the car to the lot and put the keys on someone's desk and said that they have to help her out.
- The member says that she has been up crying all night and you said that she can calm down, but she is okay, it happens to people all the time.
- The member cries saying that they tricked her, and you said that she is fine, that is why she has timeframes on contracts.
- You informed the member to take the vehicle back, take someone with her who can videotape her dropping it off, asking the dealer where they want the keys, have a paper that states that you want the contract nullified and that the first payment needs to be made before anything is solid.
- You attempted to pull up the member information and told her we don't have her lease in the system yet.
- You suggested she write a letter saying she does not want the car and to date and sign the paper, and by law they have to honor it.
- You told the member that you can provide her with very general information to get the ball rolling with the written document, and the video but suggest that she obtain an attorney.
- The member asks for confirmation if the loan was in the system, you confirmed the loan isn't in the system.
- The member says she will do what was suggested and the call concludes.

Since the loan was not showing in DNA yet, you should have transferred the member to the Loans in Process department in order for them to advise the member of their potential options based on the agreement that was signed which is in accordance with our procedures on S3 University Contact Center General Bethpage Results (s3.local). You should never provide members with personal advice or suggestions on how to handle a situation.

As a result of this conversation, the member followed your guidance and returned to the dealership demanding to return the vehicle which created a continued negative member experience, a corporate complaint, and impact to our partner credit union.

**Expectations**

Revised 2/2023

**EXHIBIT 6**

It is expected that you to strive to meet all of the S3 STAR values (Service, Teamwork, Attitude, and Results). In accordance with the Results principle, you should be accountable for producing quality results, ensure accurate and timely execution the first time, and show commitment and resilience toward achieving goals. Additionally, the Service principle includes being member focused and exceeding expectations and showing ownership for the Member Experience.

Following all department and company SOP's, procedures, and policies is essential to meeting the STAR principles and providing the highest quality of service to our partner credit unions and their members.

I am confident that you understand the seriousness of this situation and that you will strive to follow all SOP's and procedures to prevent future impact to the team, members, or partners.

### Consequences

Failure to demonstrate immediate and sustained improvement may result in further corrective action, up to and including termination of your employment.

### Previous Warnings

| Date | Type of Corrective Action | Level of Corrective Action |
|------|---------------------------|----------------------------|
|      |                           |                            |
|      |                           |                            |
|      |                           |                            |
|      |                           |                            |

### Employee's Statement (use additional paper if necessary)

### Acknowledgement

By signing below, you acknowledge and understand this warning, and that you are expected to demonstrate immediate and sustained improvement.  For no less than 90 days following the date of delivery of this Corrective Action notice, the following guidelines will apply:

1.  You will not be eligible to apply for any posted positions.
2.  You may not be eligible to receive a salary review/merit increase or bonuses, if applicable.
3.  Your employment at will status will not be altered by this Corrective Action, nor is your employment for any fixed duration of time.
4.  The duration of this document may be extended and/or the level escalated if immediate and sustained improvement is not demonstrated and/or additional concerns surface during the timeframe of this document.

| | |
|---|---|
| See email acknowledgement.<br>Employee's Signature | 4/28/2023<br><br>Date: |
| Chris Baker<br>Manager's Signature | 4/28/2023<br><br>Date: |
| | |

Revised 2/2023

**EXHIBIT 8**

| Employee Corrective Action | | | |
|---|---|---|---|
| **Employee's Name** | Curtis Parker | **Date** | 08/01/2023 |
| **Employee's Title** | Member Service Representative | **Department** | Contact Center |
| **Date of Hire** | 11/14/2022 | **Manager** | Christopher Klunk |
| Type of Corrective Action (select one) | | | |
| | Attendance | | Policy/Procedure |
| X | Performance | | Behavior/Conduct |
| | | | |
| X | Verbal Warning | | Final Written Warning |
| | Written Warning | | |

### Description of Incident

Curtis, you are being placed on corrective action for not meeting the minimum Quality (QA) score during the following months:

| Month | QA Score |
|---|---|
| May 2023 | 61.86% |
| June 2023 | 44.12% |
| July 2023 | 44.12% |

When you do not meet our Quality standard, it can create a negative member experience and impact our partner credit unions.

### Expectations

It is expected that you to strive to meet all of the S3 STAR principles (Service, Teamwork, Attitude, and Results). In accordance with the Service principle, you should be member focused and exceed expectations, empathize with member needs and concerns, and show ownership for the member experience. The Results principle explains that you should be accountable for producing quality results, ensure accurate and timely execution the first time, and show commitment and resilience toward achieving goals.

It is expected that there is both immediate and sustained improvement to your work performance to meet the performance expectations for your position.

Outlined below is an action plan with expectations that you will be required to meet within the designated timeframe. In order to be successful, it is critical that you take a proactive role in meeting performance expectations.

During the action plan period, I will continue to work with you in your efforts to improve your overall performance. We will meet biweekly to review your progress, and I will offer additional coaching and support, as needed.

| Competency and/or Area of Concern | Expectation | Timeframe |
|---|---|---|
| Results | You should strive to achieve Quality (QA) score expectation of 80%. | Immediately |

Revised 3/2022

**EXHIBIT 8**

## Deven Jones

| | |
|---|---|
| **From:** | Christopher J. Baker |
| **Sent:** | Tuesday, August 8, 2023 12:36 PM |
| **To:** | Chelsea Szoke; Caroline Ryan |
| **Cc:** | Christopher Klunk; Deven Jones |
| **Subject:** | RE: Curtis Parker - QA Performance Verbal Warning Corrective Document |
| **Attachments:** | Corrective Action- QA Results (GCC) - Curtis Parker.docx |

Hi Team,

I have electronically singed the attached corrective action document.

Thank you,

Chris Baker
**Senior Contact Center Manager**
S3 Shared Service Solutions, LLC
443-517-5157
www.s3cuso.com


**From:** Christopher Klunk <CKlunk@s3cuso.com>
**Sent:** Tuesday, August 8, 2023 1:51 PM
**To:** Christopher J. Baker <CJBaker@s3cuso.com>
**Subject:** FW: Curtis Parker - QA Performance Corrective Document

Chris,

This has been delivered.  Please sign whenever you have a chance.

Thank you,

**Chris Klunk**
**Manager, Contact Center**
S3 Shared Service Solutions, LLC
O:  443-517-5578
www.s3cuso.com



**From:** Curtis Parker <cuparker@s3cuso.com>
**Sent:** Tuesday, August 8, 2023 12:21 PM
**To:** Christopher Klunk <CKlunk@s3cuso.com>
**Subject:** RE: Curtis Parker - QA Performance Corrective Document

Chris,
I reviewed the document ,please consider signed thanks

1

# EXHIBIT 9

| Employee Corrective Action | | | |
|---|---|---|---|
| **Employee's Name** | Curtis Parker | **Date** | 09/05/2023 |
| **Employee's Title** | Member Service Representative | **Department** | GCC |
| **Date of Hire** | 11/14/2022 | **Manager** | Christopher Klunk |
| Type of Corrective Action (select one) | | | |
| | Attendance | | Policy/Procedure |
| X | Performance | | Behavior/Conduct |
| | | | |
| | Verbal Warning | | Final Written Warning |
| X | Written Warning | | |

### Description of Incident

Curtis, you are being placed on corrective action for not meeting the minimum Quality (QA) score during the following months:

| Month | QA Score |
|---|---|
| May 2023 | 61.86% |
| June 2023 | 44.12% |
| July 2023 | 44.12% |
| August 2023 | 67.97% |

When you do not meet our Quality standard, it can create a negative member experience and impact our partner credit unions.

### Expectations

It is expected that you to strive to meet all of the S3 STAR principles (Service, Teamwork, Attitude, and Results). In accordance with the Service principle, you should be member focused and exceed expectations, empathize with member needs and concerns, and show ownership for the member experience. The Results principle explains that you should be accountable for producing quality results, ensure accurate and timely execution the first time, and show commitment and resilience toward achieving goals.

It is expected that there is both immediate and sustained improvement to your work performance to meet the performance expectations for your position.

Outlined below is an action plan with expectations that you will be required to meet within the designated timeframe. In order to be successful, it is critical that you take a proactive role in meeting performance expectations.

During the action plan period, I will continue to work with you in your efforts to improve your overall performance. We will meet weekly to review your progress, and I will offer additional coaching and support, as needed.

| Competency and/or Area of Concern | Expectation | Timeframe |
|---|---|---|

Revised 3/2022

**EXHIBIT 9**

Thanks

Kind Regards,
Curtis Parker
Member Service Representative, Contact Center
S3 Shared Service Solutions, LLC
www.s3cuso.com



**From:** Christopher Klunk <CKlunk@s3cuso.com>
**Sent:** Friday, September 8, 2023 9:51 AM
**To:** Curtis Parker <cuparker@s3cuso.com>
**Subject:** Curtis Parker - QA Performance Corrective Document

Curtis,

Please review the attached document we discussed today.  Respond back to this email that you received and understand the document, this will serve as your signature.

Here is the breakdown from August:

| Date | Operations QA |
|------------|-----------|
| 08/02/2023 | 0% |
| 08/10/2023 | 77.78% |
| 08/21/2023 | 94.12% |
| 08/28/2023 | 100% |
| **TOTAL** | 67.97% |

Thank you,

**Chris Klunk**
Manager, Contact Center
S3 Shared Service Solutions, LLC
O:  443-517-5578
www.s3cuso.com



**EXHIBIT 9**

## Chelsea Szoke

| | |
|---|---|
| **From:** | Christopher J. Baker |
| **Sent:** | Friday, September 8, 2023 6:15 PM |
| **To:** | Christopher Klunk |
| **Cc:** | Chelsea Szoke; Caroline Ryan; Deven Jones |
| **Subject:** | RE: Curtis Parker – QA Performance Corrective Document |

Hi Team,

I have electronically signed the attached corrective action document.

Thank you,

Chris Baker
Senior Contact Center Manager
S3 Shared Service Solutions, LLC
443-517-5157
www.s3cuso.com

**From:** Christopher Klunk <CKlunk@s3cuso.com>
**Sent:** Friday, September 8, 2023 11:06 AM
**To:** Christopher J. Baker <CJBaker@s3cuso.com>
**Subject:** FW: Curtis Parker – QA Performance Corrective Document

Chris,

This has been delivered.  Please sign when you have a chance.

Thank you,

**Chris Klunk**
Manager, Contact Center
S3 Shared Service Solutions, LLC
O:  443-517-5578
www.s3cuso.com



**From:** Curtis Parker <cuparker@s3cuso.com>
**Sent:** Friday, September 8, 2023 10:00 AM
**To:** Christopher Klunk <CKlunk@s3cuso.com>
**Subject:** RE: Curtis Parker – QA Performance Corrective Document

Chris ,
I reviewed the corrective action ,and sign by sending back the email..

1

# EXHIBIT 10

| Employee Corrective Action | | | |
|---|---|---|---|
| **Employee's Name** | Curtis Parker | **Date** | 10/01/2023 |
| **Employee's Title** | Member Service Representative | **Department** | GCC |
| **Date of Hire** | 11/14/2022 | **Manager** | Christopher Klunk |
| Type of Corrective Action (select one) | | | |
| | Attendance | | Policy/Procedure |
| X | Performance | | Behavior/Conduct |
| | | | |
| | Verbal Warning | X | Final Written Warning |
| | Written Warning | | |
| Description of Incident | | | |

Curtis, you are being placed on corrective action for not meeting the minimum Quality (QA) score during the following months:

| Month | QA Score |
|---|---|
| May 2023 | 61.86% |
| June 2023 | 44.12% |
| July 2023 | 44.12% |
| August 2023 | 67.97% |
| September 2023 | 25.00% |

Additionally, we have also seen multiple errors with SWBC payments.

Below is a list of some recent examples of these errors:
- 8/29/2023– Loan payment processed for the incorrect credit union.
- 8/29/2023- Loan payment processed for the incorrect credit union (different member than the prior error).
- 9/5/2023 – Payment processed for the incorrect credit union.
- 9/6/2023 – Payment processed for the incorrect credit union.

On 9/8/2023, Chris Baker and Chris Klunk met with you to discuss these errors and the importance of slowing down, doubling checking your work and using your resources.

Since then, two additional errors occurred:
- 9/12/2023- You submitted an external loan payment in SWBC for the amount of $404.81 (Members "Regular monthly payment"), however you submitted the payment in DNA for $504.81. ($100.00 additional)
- 9/14/2023 – You entered member's external account number incorrectly. The member repeated the checking account number twice; however, you ended up reading back the numbers incorrectly at the end, which member ended up confirming "Yes."
- 9/19/2023- "Transaction Description" for the "General Ledger Disbursement" not entered on ECM payment.

Your errors and failure to meet our Quality standard can create a negative member experience and impact our partner credit unions, including financial loss.

Revised 3/2022

**EXHIBIT 10**

## Expectations

It is expected that you to strive to meet all of the S3 STAR principles (Service, Teamwork, Attitude, and Results). In accordance with the Service principle, you should be member focused and exceed expectations, empathize with member needs and concerns, and show ownership for the member experience. The Results principle explains that you should be accountable for producing quality results, ensure accurate and timely execution the first time, and show commitment and resilience toward achieving goals.

It is expected that there is both immediate and sustained improvement to your work performance to meet the performance expectations for your position.

Outlined below is an action plan with expectations that you will be required to meet within the designated timeframe. In order to be successful, it is critical that you take a proactive role in meeting performance expectations.

During the action plan period, I will continue to work with you in your efforts to improve your overall performance. We will meet weekly to review your progress, and I will offer additional coaching and support, as needed.

| Competency and/or Area of Concern | Expectation | Timeframe |
|---|---|---|
| Results- Quality | You should strive to achieve Quality (QA) score expectation of 80%.<br><br>You must meet and maintain the minimum Quality score of 70%. | Immediately<br><br><br>12/31/2023 |
| Results- Accuracy | Ensure that all payments are processed accurately without any errors including, but not limited to:<br>• Confirm that all payment amounts are the correct amount.<br>• Ensure that the correct account number is utilized.<br>• Ensure that the correct credit union is selected for each transaction. | 11/30/2023 |

## Consequences

Failure to demonstrate immediate and sustained improvement may result in further corrective action, up to and including termination of your employment.

## Previous Warnings

| Date | Type of Corrective Action | Level of Corrective Action |
|---|---|---|

Revised 3/2022

**EXHIBIT 10**

| 04/28/2023 | Procedure | Final Warning |
|---|---|---|
| 08/08/2023 | Performance- Quality | Verbal Warning |
| 09/08/2023 | Performance- Quality | Written Warning |
| | | |

| Employee's Statement (use additional paper if necessary) |
|---|
| |

| Acknowledgement |
|---|

By signing below, you acknowledge and understand this warning, and that you are expected to demonstrate immediate and sustained improvement. For no less than 90 days following the date of delivery of this Corrective Action notice, the following guidelines will apply:

1. You will not be eligible to apply for any posted positions.
2. You may not be eligible to receive a salary review/merit increase or bonuses, if applicable.
3. Your employment at will status will not be altered by this Corrective Action, nor is your employment for any fixed duration of time.
4. The duration of this document may be extended and/or the level escalated if immediate and sustained improvement is not demonstrated and/or additional concerns surface during the timeframe of this document.

| Curtis Parker electronically signed<br>Employee's Signature | Date: 9/29/23 |
|---|---|
| Christopher Klunk<br>Manager's Signature | Date: 9/29/23 |
| Director's Signature : Chris Baker | Date: 10/2/2023 |
| Human Resources' Signature | Date: |

Revised 3/2022

# EXHIBIT 10

**Chelsea Szoke**

| | |
|---|---|
| **From:** | Christopher J. Baker |
| **Sent:** | Monday, October 2, 2023 10:13 AM |
| **To:** | Chelsea Szoke; Caroline Ryan; Deven Jones |
| **Cc:** | Christopher Klunk |
| **Subject:** | RE: Curtis Parker – QA Performance Final Warning |
| **Attachments:** | Curtis Parker Final Warning Performance 9.28.23.docx |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Team,

I have electronically signed the attached corrective action document.

Thank you,

Chris Baker
Senior Contact Center Manager
S3 Shared Service Solutions, LLC
443-517-5157
www.s3cuso.com

**From:** Christopher Klunk <CKlunk@s3cuso.com>
**Sent:** Friday, September 29, 2023 3:18 PM
**To:** Christopher J. Baker <CJBaker@s3cuso.com>
**Subject:** FW: Curtis Parker – QA Performance Final Warning

Chris,

This has been delivered.  Please sign when you have a chance.

Thank you,

**Chris Klunk**
Manager, Contact Center
S3 Shared Service Solutions, LLC
O:  443-517-5578
www.s3cuso.com



**From:** Curtis Parker <cuparker@s3cuso.com>
**Sent:** Friday, September 29, 2023 3:09 PM
**To:** Christopher Klunk <CKlunk@s3cuso.com>
**Subject:** RE: Curtis Parker – QA Performance Final Warning

# EXHIBIT 10

Received and signed ..

Kind Regards,
Curtis Parker
Member Service Representative, Contact Center
S3 Shared Service Solutions, LLC

www.s3cuso.com



**From:** Christopher Klunk <CKlunk@s3cuso.com>
**Sent:** Friday, September 29, 2023 12:26 PM
**To:** Curtis Parker <cuparker@s3cuso.com>
**Subject:** Curtis Parker - QA Performance Final Warning

Curtis,

Please review the attached document we discussed today.  Respond back to this email that you received and understand the document, this will serve as your signature.

Here is the breakdown from September:

| Date | Operations QA |
|------|---------------|
| 09/06/2023 | 0% |
| 09/12/2023 | 0% |
| 09/20/2023 | 100% |
| 09/26/2023 | 0% |
| **TOTAL** | **25%** |

Thank you,


**Chris Klunk**
Manager, Contact Center
S3 Shared Service Solutions, LLC
O:  443-517-5578
www.s3cuso.com



2

# EXHIBIT 11

### MSRs Terminated for Performance Issues In 2023

| MSR | Date of Hire | Date of Termination | Race/Ethnicity |
| --- | --- | --- | --- |
| T.C. | 7/11/2022 | 1/9/2023 | Hispanic or Latino |
| V.S. | 7/11/2022 | 1/9/2023 | Hispanic or Latino |
| S.K. | 12/6/2021 | 2/22/2023 | Black or African American |
| N.R. | 11/16/2020 | 3/1/2023 | Black or African American |
| T.G. | 8/9/2021 | 3/9/2023 | Black or African American |
| J.B. | 4/13/2020 | 4/24/2023 | White |
| S.B. | 4/12/2021 | 5/5/2023 | Black or African American |
| L.M. | 7/12/2021 | 5/5/2023 | Black or African American |
| J.M. | 12/6/2021 | 5/5/2023 | White |
| E.B. | 12/5/2022 | 5/26/2023 | White |
| E.T. | 11/15/2021 | 5/31/2023 | Hispanic or Latino |
| K.K. | 3/14/2022 | 6/2/2023 | Black or African American |
| C.L. | 11/14/2022 | 6/2/2023 | Black or African American |
| R.M. | 11/15/2021 | 6/12/2023 | Black or African American |
| D.H. | 7/12/2021 | 7/7/2023 | Black or African American |
| T.R. | 7/11/2022 | 10/03/2023 | Black or African American |
| V.B. | 9/13/2021 | 10/11/2023 | Black or African American |
| R.W. | 4/14/2023 | 10/13/2023 | Black or African American |
| O.C. | 12/5/2022 | 10/16/2023 | Hispanic or Latino |
| C.R. | 7/11/2022 | 10/18/2023 | White |
| J.C. | 5/8/2023 | 10/25/2023 | Black or African American |
| Mr. Parker | 11/14/2022 | 11/3/2023 | Black or African American |
| M.L. | 12/7/2020 | 11/8/2023 | Two or more races, not Hispanic or Latino |
| M.T. | 7/11/2022 | 11/8/2023 | Black or African American |
| G.P. | 9/12/2022 | 11/10/2023 | Black or African American |
| L.S. | 9/12/2022 | 11/10/2023 | Black or African American |
| J.K. | 11/14/2022 | 11/30/2023 | Hispanic or Latino |
| M.W. | 7/12/2021 | 11/30/2023 | White |

**EXHIBIT C**



**Upgrade to a smarter Gmail**
Secure, fast & organized email

Sent M...

**Curtis Parker**

Chelsea Szoke

Date:    November 5, 2023, 7:24 AM

Good morning, Chelsea.

I am in receipt of the separation letter and documents. In reviewing the documents, We noticed the separation reason was not stated.

In the meeting with Chris Baker and yourself, Chris stated the termination reason was performance, a result of errors in the SWBC payment system.

The letter also references payroll through November 30th. Will this be on the next check or over two checks?

Thanks,

Curtis

Sent from my iPhone

On Nov 3, 2023, at 2:40 PM, Chelsea Szoke < > wrote:

<image002.png>
<image003.png>

# EXHIBIT E

—Original Message—
From: Curtis Parker <curtis.parker1776@gmail.com>
Sent: Monday, November 27, 2023 12:20 PM
To: Chelsea Szoke <CSzoke@s3cuso.com>
Subject: Parker Termination

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links from unknown senders.

Chelsea,

I just got off the phone with a representative from Ga. unemployment who stated S3 sent her information indicating my termination was due to quality.

As per the termination call, this is not the case. Please contact Unemployment and advise of the accurate cause of termination. In the meeting where I was terminated Chris Baker stated this was not for Quality. I have always considered him a honorable Man. If my unemployment is denied, through deception and fraud I will seek 3 years compensation from S3.

Regards,

Curtis Parker

Sent from my iPhone



**EXHIBIT F**



## Parker Termination

**Curtis Parker <curtis.parker1776@gmail.com>**
To: Chelsea Szoke <CSzoke@s3cuso.com>

Mon, Nov 27, 2023 at 1:49 PM

Chelsea,

S3 signed a document stating the information regarding my termination was actual and true. We both know Chris Baker stated I was not being terminated for Quality and the October Quality numbers confirm that(you don't know if I recorded the termination call. I know you did)The State of Georgia unemployment representative stated it is and would be a crime if S3 knowingly sought to deceive or mislead her.

I would ask S3 to reconsider going down this path. More than one person will have to participate in this conspiracy for you to be successful. You're putting S3 in legal and financial jeopardy and creating additional harm to me and my family.
Sent from my iPhone

> On Nov 27, 2023, at 12:49 PM, Chelsea Szoke <CSzoke@s3cuso.com> wrote:
>
> Hi Curtis,
>
> Thank you for reaching out. We do respond to all unemployment claims/calls and answer any questions fully and accurately. If they have any questions or need further clarification, they can reach out to me directly.
>
> Thank you,
>
> **Chelsea Szoke**
>
> Senior HR Business Partner
>
> S3 Shared Service Solutions. LLC
>
> O: 443-517-5006 F: 443-517-5270
>
> M: 410-707-0553
>
> www.s3cuso.com
>
> <image001.jpg>
>
> <image002.png>
> <image003.png>
>
> [Quoted text hidden]

# EXHIBIT G

**M Gmail**

Curtis Parker <curtis.parker1776@gmail.com>

---

## Parker Termination

---

**Curtis Parker** <curtis.parker1776@gmail.com>                     Mon, Nov 27, 2023 at 1:49 PM
To: Chelsea Szoke <CSzoke@s3cuso.com>

Chelsea,
S3 signed a document stating the information regarding my termination was actual and true. We both know Chris Baker stated I was not being terminated for Quality and the October Quality numbers confirm that(you don't know if I recorded the termination call. I know you did)The State of Georgia unemployment representative stated it is and would be a crime if S3 knowingly sought to deceive or mislead her.
 I would ask S3 to reconsider going down this path. More than one person will have to participate in this conspiracy for you to be successful. You're putting S3 in legal and financial jeopardy and creating additional harm to me and my family.
Sent from my iPhone


On Nov 27, 2023, at 12:49 PM, Chelsea Szoke <CSzoke@s3cuso.com> wrote:



Hi Curtis,



Thank you for reaching out. We do respond to all unemployment claims/calls and answer any questions fully and accurately. If they have any questions or need further clarification, they can reach out to me directly.



Thank you,

**Chelsea Szoke**

Senior HR Business Partner

S3 Shared Service Solutions, LLC

O: 443-517-5006 F: 443-517-5270

M: 410-707-0553

www.s3cuso.com

<image001.jpg>

<image002.png>
<image003.png>


-----Original Message-----
From: Curtis Parker <curtis.parker1776@gmail.com>
Sent: Monday, November 27, 2023 12:20 PM
To: Chelsea Szoke <CSzoke@s3cuso.com>
Subject: Parker Termination